# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KATHRYN L. JOHNS,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:12-cv-254-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Kathryn Johns filed this action asking this Court to reverse or remand the final agency decision denying her Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") under Titles II and XVI of the Social Security Act, *see* 42 U.S.C. §§ 401–434, 1381–1383f. The Administrative Law Judge ("ALJ") determined that Ms. Johns did not qualify as disabled within the meaning of the Social Security Act. (Admin. R. Doc. 476, certified copy tr. of R. of admin. proceedings: Kathryn L. Johns (hereinafter "Tr. __").) Based on the Court's careful consideration of the record, the parties' memoranda, and relevant legal authorities, the Court AFFIRMS the Commissioner's decision[1]

## **FACTUAL & PROCEDURAL HISTORY**

Ms. Johns filed for SSI and DIB on May 2, 2005. (Tr. 15.) The Regional Commissioner denied Ms. Johns's claims on January 13, 2006, and again upon reconsideration on June 22, 2006. (*Id.*) At Ms. Johns's request, a hearing before an ALJ took place on November 6, 2007.

---

[1] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

(*Id.*)  On November 27, 2007, the ALJ issued a decision denying Ms. Johns's claims.  (Tr. 12–40.)  Ms. Johns appealed this denial, and on January 21, 2011, this Court found the ALJ failed to follow the correct legal standards and remanded the case for further proceedings.  *See Johns v. Astrue*, No. 1:09-cv-00104 (D. Utah Jan. 21, 2011).

In the meantime, Ms. Johns filed another application for benefits.  (Tr. 445.)  The ALJ in that application awarded Ms. Johns benefits as of June 26, 2008.  (*Id.*)  Thus, the issue before the ALJ in this case on remand was whether Ms. Johns had a disability between her alleged onset date of April 26, 2004, and June 25, 2008.  (*Id.*)  A hearing took place before the ALJ on July 6, 2011.  (Tr. 805–40.)  On October 26, 2011, the ALJ issued a decision (the "Decision") denying Ms. Johns's claims.  (Tr. 442–76.)  Ms. Johns did not timely file an appeal to the Appeals Council, making the ALJ's Decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g).  (Tr. 435–37); *see* 20 C.F.R. §§ 404.981, 416.1481.

## I. Medical History

On April 26, 2004, a rollover car accident left Ms. Johns injured.  (Tr. 809, 815.)  St. Patrick Hospital discharged Ms. Johns on May 1, 2004, with the following diagnoses post motor vehicle crash:  alcohol intoxication, multiple rib fractures, pulmonary contusion, right pneumothorax, scalp laceration, possible mild closed head injury, and C4 fracture.  (Tr. 169.) On May 10, 2004, Dr. Bryson Smith, a neurosurgeon, evaluated Ms. Johns.  (Tr. 205.)  Dr. Smith found the accident caused a "simple spinous process fracture C4, with no injury to the other columns of the cervical spine, and no evidence of instability."  (Tr. 206.)  On May 24, 2004, Ms. Johns missed a follow-up appointment with Dr. Smith.  (Tr. 203.)  Ms. Johns dropped off new cervical spine films the next day, and Dr. Smith instructed her to follow-up in a month.  (*Id.*)

During the time at issue, Ms. Johns saw her primary care physician, Dr. Justin Mansfield, M.D., periodically. (Tr. 213–23.) Dr. Mansfield's notes indicate Ms. Johns had depression, hyperlipidemia, elevated liver function tests, and pancytopenia. (Tr. 216.) Dr. Mansfield thought Ms. Johns's alcohol consumption caused the pancytopenia. (*Id.*) Dr. Mansfield's notes also state Ms. Johns "is a heavy drinker when she cannot get her Lortab or Ativan" and that "[s]he freely admits to self medicating with her ethanol." (Tr. 215.) In April 2005, Dr. Mansfield noted Ms. Johns still suffered the same ailments plus shoulder pain. (Tr. 213.) Dr. Mansfield's notes indicate an orthopedic surgeon evaluated her shoulder. (*Id.*)

On April 1, 2005, Dr. Sheldon Thieszen, M.D., Ph.D., performed a Magnetic Resonance Imaging ("MRI") test on Ms. Johns's right shoulder. (Tr. 609–10.) Dr. Thieszen's records note three impressions: "1. Nondisplaced fracture of the coracoid process with adjacent bone marrow edema consistent with an acute to subacute injury. 2. Edema and fluid signal intensity within the infraspinatus consistent with a muscular strain given the findings at the coracoid. 3. Mild bursal surface fraying of the supraspinatus with changes in the bursa consistent with calcific bursitis." (Tr. 610.) In May 2005, Tres Ferrin, P.T., noted Ms. Johns's diagnosis as a torn right rotator cuff. (Tr. 237.) Mr. Ferrin recommended continued physical therapy to help reduce Ms. Johns's pain and help her return to her normal activities within two to three months. (*Id.*)

On June 24, 2005, Ms. Johns went to McKay-Dee Hospital after a fall. (Tr. 611.) Ms. Johns told doctors she "had been drinking nonstop over the last four days." (*Id.*) Doctors diagnosed Ms. Johns with "Alcohol abuse" and discharged her to her daughters' care. (Tr. 612.) About one week later, on July 3, 2005, police brought Ms. Johns to McKay-Dee Hospital after Ms. Johns caused a public disturbance at her apartment. (Tr. 614.) Ms. Johns told doctors she frequently drinks large amounts of alcohol; for example, she told doctors she and her boyfriend

drink about one gallon of vodka per day.  (*Id.*)  Doctors diagnosed Ms. Johns with acute alcohol intoxication and discharged her to the custody of a friend.  (Tr. 615–16.)

During the first week of November 2005, Dr. Michael Sumko, D.O., evaluated Ms. Johns's shoulder.  (Tr. 265.)  After a physical exam and a review of Ms. Johns's MRI, Dr. Sumko found Ms. Johns suffered "a rotator cuff tear with degenerative joint disease of the AC joint and calcific tendonitis."  (*Id.*)  On November 28, 2005, Dr. Sumko performed surgery on Ms. Johns's right shoulder.  (Tr. 261–63.)  Dr. Sumko's notes of an early December follow-up show the surgery relieved Ms. Johns's shoulder pain.  (Tr. 264.)  Ms. Johns saw Dr. Sumko again on January 3, 2006.  (Tr. 260.)  She told Dr. Sumko she fell down and hurt her right shoulder and back.  (*Id.*)  Dr. Sumko noted she may have torn her rotator cuff.  (*Id.*)  Dr. Sumko planned to observe Ms. Johns's symptoms over the next few weeks to see whether her condition would improve or require another MRI.  (*Id.*)  On January 17, Dr. Sumko refilled her Lortab prescription.  (*Id.*)  Ms. Johns cancelled appointments scheduled for January 19 and 31.  (*Id.*)

Dr. Craig K. Swaner, Ph.D., evaluated Ms. Johns on April 3, 2006, and prepared a psychological report on behalf of SSA.  (Tr. 331–37.)  Ms. Johns told Dr. Swaner she first developed alcohol-dependence problems at age 28.  (Tr. 334.)  She also admitted to difficulties with street drugs—specifically methamphetamine in the last year—but said she had not taken any for several months.  (*Id.*)  Dr. Swaner diagnosed Ms. Johns with pain disorder, alcohol dependence, and dependent personality disorder, among other things.  (Tr. 337.)

Ms. Johns finally returned to Dr. Sumko on April 4, 2006, and again for a follow-up on April 11, 2006.  (Tr. 714–15.)  Dr. Sumko examined Ms. Johns's spine, right elbow, and previous rotator cuff tear.  (*Id.*)  Dr. Sumko also examined x-ray images Ms. Johns brought from a previous accident, finding a compression fracture at T6.  (*Id.*)  Dr. Sumko prepared a treatment

plan recommending Ms. Johns go on light duty at work, come for rechecks as needed, and update him on her cubital tunnel type symptoms on her wrist and hand. (*Id.*)

In early 2007, Ms. Johns had her probation from a previous DUI charge revoked. (Tr. 385.) As a result, on May 7, 2007, Cornerstone Behavioral Health evaluated Ms. Johns. (Tr. 385–91.) Cornerstone's report notes Ms. Johns previously completed two 30-day treatment programs but failed to begin intensive outpatient treatment upon completion of the second program, as recommended. (Tr. 386.) The report also states Ms. Johns first tried alcohol at age 16 and began drinking regularly at age 28. (*Id.*) The report also noted a gap of approximately one year since Ms. Johns's last medical exam. (Tr. 388.) Cornerstone diagnosed Ms. Johns with alcohol dependence with physiological dependence and recommended either inpatient treatment or participation in a "drug court program." (Tr. 390–91.)

On November 1, 2007, Dr. Sumko completed a Physical Residual Functional Capacity Assessment for Ms. Johns noting exertional limitations and the need for breaks. (Tr. 398–407.) Dr. Sumko also sent a brief narrative to Ms. Johns's attorney. (Tr. 713.)

## II. Work History

From 1982 to 1986 Ms. Johns worked as an office manager in a medical clinic. (Tr. 111.) This job required Ms. Johns to supervise and assist with office scheduling, medical claims processing, and payment verification, among other things. (Tr. 117.) Ms. Johns next worked from 1988 to 1993 as a human resources representative for a hospital. (Tr. 111, 116.) Among other duties, this job required Ms. Johns to post open positions and present benefits to employees during orientation. (Tr. 116.) From 1989 to 1995 Ms. Johns owned and operated three fast food restaurants. (Tr. 111, 115.) Ms. Johns managed the operations, training, purchasing, advertising, and accounting for all three locations. (Tr. 115.) During 1993, Ms. Johns worked as an

operations manager for Home Health. (Tr. 111.) She coordinated operations for four office locations and supervised support staff. (Tr. 114.) From 1996 to 2003 Ms. Johns worked as an operations manager doing insurance billing in a physician's office. (Tr. 111, 113.) Ms. Johns also managed accounts, customer service, and collections. (Tr. 113.) From 1994 to 2003 Ms. Johns also worked for a hospital as a data coordinator. (Tr. 111, 112.)

At the Hearing, Ms. Johns testified about her departure from her last data coordinator job with IHC. (*See* tr. 808–10.) Ms. Johns had entered an inpatient treatment facility in February 2004, requiring IHC to fill her scheduling position. (*Id.*) IHC gave Ms. Johns six months to find another job within the company, but after her April 2004 car accident she could not return to work. (Tr. 809.)

In 2006 Ms. Johns also worked in child-support collections but had to leave that position because of her back problems. (Tr. 810–11.) In 2007, Ms. Johns trained as a CNA at the Wyoming State Hospital but did not complete the training. (Tr. 811.) Ms. Johns prepared taxes for H&R Block for three and a half months during 2008, but that job only lasted during tax season. (*Id.*) Ms. Johns also said she worked as a convenience store cashier in Wyoming. (Tr. 810.) She also apparently had a three or four acre farm in West Weaver for a period of time. (Tr. 809.)

## STANDARD OF REVIEW

42 U.S.C. §§ 405(g) and 1383(c)(3) provide for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA"). The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards. 42 U.S.C. §405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The Commissioner's findings shall stand if supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).[2] The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of the evidence," *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks

---

[2] Courts apply the same analysis in determining disability under Title II and Title XVI. See *House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. §§ 404.1520, 416.920;

*Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ evaluated Ms. Johns's claim through step four, making the following findings of fact and conclusions of law with respect to Ms. Johns:

1. "[Ms. Johns] meets the insured status requirements of the Social Security Act through December 31, 2010." (Tr. 448.)
2. "[Ms. Johns] has not engaged in substantial gainful activity since April 26, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)" (*Id.*)
3. "[Ms. Johns] has the following severe impairments: degenerative disc disease of the lumbar, thoracic and cervical spine (5F/10-12); history of rotator cuff repair on right shoulder (10F/2-3; 14F/3, 5; 28F/4-5); pain disorder (30F/9); personality disorder (30F/9); and substance abuse (22F/2; 30F/9) (20 CFR 404.1520(c) and 416.920(c))." (*Id.*)
4. "[Ms. Johns] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (Tr. 449.)
5. "[Ms. Johns] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations. [Ms. Johns] can lift 20 pounds occasionally and 10 pounds frequently. She must be able to sit and stand at will. She can never climb ladders, ropes or scaffolds. She can occasionally climb ramps or stairs, balance, kneel, stoop, crouch and crawl. She can frequently push/pull

      with her right upper extremity and occasionally reach overhead with her right upper extremity. She must avoid all hazards such as heights and machinery. She has mild mental limitations, defined as 10% or less overall restriction, in her ability to perform activities within a schedule, make simple work decisions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting." (Tr. 451.)

6. "<u>With or without the effects of substance </u>abuse, [Ms. Johns] is capable of performing past relevant work as a billing typist and personnel scheduler. This work does not require the performance of work-related activities precluded by [her] residual functional capacity (20 CFR 404.1565 and 416.965)." (Tr. 474) (emphasis in original).
7. "Because, with or without substance abuse, [Ms. Johns] can return to previous work and can also perform other work in the national economy, [her] substance abuse disorder is not material to this determination of disability (20 CFR 404.1520(g) and 416.920(g))." (Tr. 475.)
8. [Ms. Johns] has not been under a disability, as defined in the Social Security Act, from April 26, 2004, through the date of this decision (20 CFR 404.1520(f) and 416.920(f))." (*Id.*)

In short, the ALJ concluded Ms. Johns did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that she had the residual functional capacity to perform past relevant work as a billing typist and personnel scheduler, and thus that she had not had a disability since the alleged onset date of April 26, 2004. (Tr. 445–76.)

In support of her claim that this Court should reverse the Commissioner's decision, Ms. Johns argues the ALJ erred: (1) by failing to comply with the time period set forth in the District Court's remand; (2) by improperly evaluating physician evidence; (3) by improperly evaluating Ms. Johns's credibility; (4) by improperly determining Ms. Johns's residual functional capacity; and (5) by failing to resolve the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles. Because of these alleged errors, Ms. Johns argues this Court should reverse the Commissioner's decision with an instruction to award Ms. Johns benefits. The Court addresses each argument in turn.

## I. Time Period on Remand

The SSA found Ms. Johns disabled as of June 26, 2008, in a subsequent disability application. (Tr. 445.) Thus, the Decision Ms. Johns appeals governs whether Ms. Johns qualified as disabled between her alleged disability onset date of April 26, 2004, and June 25, 2008. Because the Decision states "[Ms. Johns] has not been under a disability, as defined in the Social Security Act, from April 26, 2004, through the date of this decision," (Tr. 475), Ms. Johns argues the ALJ erred by failing to comply with the proper time period. (Pl.'s Br. 12–13, [ECF No. 17](#).) The Court disagrees.

A Social Security claimant cannot be concurrently disabled and not disabled. Accordingly, in *Hirst v. Astrue*, No. 2:09-CV-00825-DN, 2011 WL 1226096, at *2 (D. Utah Mar. 28, 2011), this Court remanded for further administrative proceedings under sentence six of [42 U.S.C. § 405(g)](#) where a time-period overlap in two ALJ decisions found the claimant to be concurrently disabled and not disabled. In *Hirst*, the ALJ's decision stated it covered "the time period beginning one day after a previous denial by another judge" but repeatedly referred to a specific date before that denial. *Id.* (quotations omitted). Thus, despite the one clear statement of the proper time period, whether the ALJ had actually improperly considered an overlapping time period remained unclear from the decision. *Id.*

This case poses the inverse scenario from *Hirst*. Here, the ALJ decision in one place misidentifies the relevant time period but otherwise clearly shows the ALJ actually considered only the date range at issue. For example, the Decision repeatedly notes the correct time period, (tr. 445, 464, 472), and concludes Ms. Johns did not qualify as disabled "from April 26, 2004, through June 25, 2008." (Tr. 446.) The Decision also shows the ALJ took care to examine only the evidence applicable to the relevant time period, for example, by limiting consideration of Dr.

Sumko's statements to those pertinent to the time period. (*See* tr. 472.) Therefore, the Decision's statement that "[Ms. Johns] has not been under a disability, as defined in the Social Security Act, from April 26, 2004, through the date of this decision," (tr. 475), reflects "a mere scrivener's error and did not affect the outcome of the case," *Poppa v. Astrue*, 569 F.3d 1167, 1172 (10th Cir. 2009) (finding ALJ's misstatement of surgery dates to constitute scrivener's error because ALJ noted correct date earlier in decision).

## II. Evaluation of Physician Evidence

Ms. Johns argues the ALJ erred by failing to provide legitimate reasons for according little weight to the opinion of her treating medical provider, Dr. Sumko, and according considerable weight to the medical expert who testified at the hearing, Dr. Enright. (Pl.'s Br. 13–15, ECF No. 17.) The Court disagrees.

An ALJ must evaluate every medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors. 20 C.F.R. §§ 404.1527(c) and 416.927(c) provide these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*See Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted). To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons.'" *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not discuss explicitly all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (reflecting the ALJ's duty to resolve conflicting medical evidence).

Here, the ALJ did not accord controlling weight to Ms. McEwen's treating medical provider's opinion. Instead, the ALJ's decision provided specific, legitimate reasons for granting "little weight" to Dr. Sumko's opinion. (Tr. 471–72.) First, the ALJ noted Dr. Sumko's opinion lacked support from medically acceptable clinical and laboratory techniques. (Tr. 472.) For example, the ALJ noted that while Dr. Sumko only treated Ms. Johns's shoulder, his opinion included restrictions on standing, walking, and visual limitation. (*Id.*) Second, the ALJ noted Dr. Sumko's opinion did not comport with other evidence. (*Id.*) For example, Dr. Morrison, the medical expert who testified at the first hearing, found Dr. Sumko's postural limitations "overly generous under the circumstances." (*Id.*) The ALJ also noted Dr. Sumko only treated Ms. Johns for a short time, from late 2005 to 2006, and that almost two years separated his latest treatment of Ms. Johns and the date of his opinion; he therefore lacked current information on Ms. Johns's condition when he gave his opinion. (*Id.*) Finally, the ALJ noted Dr. Sumko's progress notes did not indicate familiarity with Ms. Johns's extensive medical record. (*Id.*)

The ALJ accorded considerable weight to Dr. Enright's opinion. (Tr. 473.) In support of that weight, the ALJ noted Dr. Enright qualifies as a psychological expert with the Social Security Administration and has experience with determining limitations based on diagnosed mental conditions involving substance abuse. (*Id.*) *See* 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii) (noting ALJs may consider medical experts' "medical specialty and expertise in our rules" in evaluating opinion evidence). The ALJ also noted Dr. Enright had all of Ms. Johns's medical evidence from the period at issue and that his opinion generally aligned with the State agency physician's opinion. (Tr. 473.)

Because the ALJ provided specific, legitimate reasons for according little weight to Dr. Sumko's opinion and considerable weight to Dr. Enright's opinion, supported by substantial record evidence, this Court finds no error.

### III. Evaluation of Ms. Johns's Credibility

Ms. Johns next argues the ALJ did not properly evaluate her credibility. (Pl.'s Br. 15–16, ECF No. 17.) The Court disagrees.

"'Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990)). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)). If objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's assertions. *Id.* To do this, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id.* (citation and internal quotation marks omitted). But this analysis "does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ found one could reasonably expect Ms. Johns's medically determinable impairments could to cause her alleged symptoms. (Tr. 470.) However, the ALJ found Ms. Johns's statements about the intensity, persistence, and limiting effects of her symptoms lacked credibility. (*Id.*) The ALJ provided many reasons for making this finding. (*See* tr. 464–70.) First, the ALJ found the record did not support Ms. Johns's statements about the severity of her symptoms. (Tr. 464–65.) For example, the ALJ noted Ms. Johns listed shoulder problems as the main complaint on a July 2005 questionnaire, (tr. 102–06), but she did not seek medical care for her shoulder between April 15, 2005, and November 3, 2005, (tr. 464). The ALJ also noted that Ms. Johns complained of dizziness and lightheadedness in July 2005 but had previously reported significant improvement in those problems after discontinuing her blood pressure medications. (Tr. 464.)

Second, the ALJ noted Ms. Johns's record contains many contradictions. (Tr. 466.) For example, Ms. Johns testified at the hearing that she did not have a problem with drugs other than alcohol, (tr. 818), but told Dr. Craig Swaner in 2006 that she had significant difficulties with street drugs and became involved with methamphetamine during the year prior, (tr. 334). (Tr. 467.) The ALJ also noted that despite Ms. Johns's testimony that the April 2004 accident did not

relate to alcohol, records from the resultant hospital visit show Ms. Johns was intoxicated. (Tr. 468, 169.) Finally, the ALJ noted Ms. Johns did not always comply with her treatment and repeatedly failed to attend scheduled follow-up visits. (Tr. 467.) For example, after a hospitalization in January 2004, the doctor told Ms. Johns to follow up with Weber Human Services on January 30, 2004. (Tr. 142.) Ms. Johns did not follow up with Weber Services until July 2005, over a year later. (*See* tr. 266–330, 467.) Similarly, Dr. Bryson Smith's record of a February 2005 visit notes he felt "surprised" to see Ms. Johns and that she had a history of "not showing for prior appointments." (Tr. 201, 467.)

For the reasons set forth above, the Court finds substantial evidence supports the ALJ's evaluation of Ms. Johns's credibility.

### IV. RFC Determination

A claimant's residual functional capacity ("RFC") reflects the ability to do physical, mental, and other work activities on a sustained basis despite limitations from the claimant's impairments. See 20 C.F.R. §§ 404.1545, 416.945. The step-four analysis involves three phases:

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (citation omitted). In determining the claimant's RFC, the decision maker considers all of the claimant's medically determinable impairments, including those considered not "severe." *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

Ms. Johns argues the ALJ erred at phase one because the ALJ's decision provides "no reasoning and no citations to specific facts," and because the ALJ did not discuss "uncontroverted evidence not relied upon and the probative evidence she rejected." (Pl.'s Br. 16–17, ECF No. 17.) The Court disagrees.

The ALJ's determination of Ms. Johns's residual functional capacity includes ample discussion and citations to evidence. The Decision's discussion of Ms. Johns's residual functional capacity spans approximately twenty-four pages and includes frequent citations to the record. (*See* tr. 451–474.) The Decision first sets forth Ms. Johns's testimony about her symptoms and relevant treatment history. (*See* tr. 452–64.) The Decision next discusses the ALJ's determination of Ms. Johns's credibility. (*See* tr. 464–70.) These discussions include many citations to record evidence; as noted in the above discussion, the ALJ provided specific reasons and citations to record evidence to support her determination of Ms. Johns's credibility.

The Decision then considered the medical opinion evidence and statements from third-party witness Ruth Davis, Ms. Johns's mother. (Tr. 470–74.) Ms. Johns does not challenge the ALJ's treatment of Ms. Davis's testimony, and this Court has already found substantial evidence supports the ALJ's weighing of the medical opinion evidence. The ALJ's discussion of this evidence undercuts Ms. Johns's argument that the ALJ did not explain and support her determination of Ms. Johns's residual functional capacity adequately. *See Poppa*, 569 F.3d at 1171 ("Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.")

Ms. Johns next argues the ALJ erred by not discussing the "uncontroverted evidence not relied upon and the probative evidence she rejected." (Pl.'s Br. 17, ECF No. 17.) But Ms. Johns does not identify what uncontroverted or probative evidence she refers to or where this evidence

appears in the record. Neither does she provide any substantive analysis of this argument. "The court is not required to consider poorly developed arguments." *Cross v. Colvin*, No. 12-CV-01722-WYD, 2013 WL 5402056, at *2 (D. Colo. Sept. 26, 2013); *see also Anderson v. Colvin*, No. 12-CV-01282-REB, 2013 WL 3216140, at *3 n.3 (D. Colo. June 25, 2013) (declining to consider inadequately briefed and undeveloped arguments). Because Ms. Johns does not identify the evidence she argues the Decision improperly ignores—nor does any such evidence immediately come to the Court's attention—the Court declines to consider this argument.

Accordingly, the Court finds the ALJ applied the proper legal standards and substantial evidence supports the ALJ's determination of Ms. Johns's residual functional capacity.

### V. Vocational Expert Testimony

Ms. Johns next argues the ALJ erred by improperly relying on vocational expert testimony without eliciting a reasonable explanation for any conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"). (Pl.'s Br. 18–19, ECF No. 17.) The Court disagrees.

Ms. Johns argues that because the ALJ's residual functional capacity determination includes a sit/stand option and the DOT does not address sit/stand options, SSR 00-4p required the ALJ to elicit from the vocational expert a reasonable explanation for that conflict. SSR 00-4p discusses how ALJs should approach conflicts between vocational expert testimony and the DOT. SSR 00-4p states in pertinent part:

> Occupational evidence provided by a VE [vocational expert] or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). During the vocational expert's testimony, the ALJ asked to what extent her testimony was consistent with the DOT. (Tr. 836.) The vocational expert replied "I believe it's entirely consistent." (*Id.*) In her Decision the ALJ cited SSR 00-4p in noting her determination that the vocational expert's testimony was consistent with the DOT. (Tr. 475.) This Court likewise finds the vocational expert's testimony did not conflict with the DOT, and, therefore, the ALJ did not run afoul of SSR 00-4p.

The DOT does not discuss sit/stand options. Thus, many courts have held that a sit/stand option does not conflict with the DOT. *See, e.g.*, *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) ("Because the *DOT* does not address the subject of sit/stand options, it is not apparent that [testimony based on a sit/stand restriction] conflicts with the *DOT*."); *Stevens v. Colvin*, No. 5:12CV1105, 2013 WL 1747728, at *9 (N.D. Ohio Apr. 23, 2013) (noting "courts throughout [the Sixth C]ircuit have repeatedly found that while the DOT does not explicitly refer to the sit/stand option, a vocational expert's opinion regarding such an option does not contradict the DOT" and citing cases); *Conn v. Astrue*, 852 F. Supp. 2d 517, 528–29 (D. Del. 2012) ("the VE's testimony and the DOT are not in conflict; the DOT simply does not address sit/stand options."). On this basis, courts have found that a vocational expert's testimony based on a sit/stand restriction does not conflict with the DOT but instead provides "more specific information than is contained in the DOT . . ." *See Seay v. Astrue*, No. 3:09-CV-01044, 2011 WL 780693, at *12 (M.D. Tenn. Feb. 28, 2011) *report and recommendation adopted*, No. 3:09-CV-01044, 2011 WL

977499 (M.D. Tenn. Mar. 18, 2011).[3] This Court finds this reasoning persuasive because it accords with SSR 00-4p, which states:

> The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A [vocational expert] . . . or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

SSR 00-4p, 2000 WL 1898704, at *3. SSR 00-4p therefore "recognizes and allows for the possibility that a [vocational expert] might provide more specific information than is contained in the DOT." *Seay*, 2011 WL 780693, at *12. Accordingly, Ms. Johns's argument fails.

## CONCLUSION

Based on the foregoing, the Court finds that substantial evidence supports the Commissioner's decision; the Commissioner applied the correct legal standards; and AFFIRMS the Commissioner's decision in this case.

DATED this 4th day of March, 2014.

BY THE COURT:

*[signature]*
Evelyn J. Furse
United States Magistrate Judge

---

[3] Some courts have found a sit/stand option necessitates further inquiry under SSR 00-4p. *Novak v. Comm'r of Soc. Sec. Admin.*, No. 9:08-2687-HFF-BM, 2009 WL 1922297, at *2 (D.S.C. June 30, 2009) (citing cases).